UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

```
_____
                             )
RICHARD ROSENTHAL,           )
                             )
          Petitioner,        )
                             )
          v.                 )  CIVIL ACTION
                             )  NO. 10-10122-WGY
STEVE O'BRIEN,               )
                             )
          Respondent.        )
_____)
```

MEMORANDUM AND ORDER

YOUNG, D.J.                              September 30, 2011

## I.    INTRODUCTION

Richard Rosenthal ("Rosenthal") brings this petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254.  Pet., ECF No. 1.  He presents four grounds for relief: (1) he was deprived of due process by the motion judge's denial of his motion for a new trial without a competency hearing (Ground 1); (2) he was deprived of due process when the motion judge ruled that there was no lack of inquiry into the validity of Rosenthal's waiver of his right to testify (Ground 2); (3) he was deprived of due process by the ineffective assistance of trial counsel (Ground 3); and (4) he was deprived of due process by the ineffective assistance of the appellate counsel (Ground 4).  Pet. App. Attach. Grounds, ECF No. 1-2.

A.     **Procedural Posture**

On November 7, 1996, following a jury trial in Middlesex Superior Court (Graham, J.), Rosenthal was convicted of murder in the first the degree based on extreme atrocity or cruelty. Commonwealth v. Rosenthal, 432 Mass. 124, 124 (2000).  Rosenthal did not dispute that he committed the murder, but claimed that he was not criminally responsible.  Id.  After his conviction, Rosenthal appealed, and the Supreme Judicial Court affirmed his conviction and denied relief under Massachusetts General Laws chapter 278, section 33E.  Id. at 124, 131.  On October 22, 2008, Rosenthal moved for a new trial, pursuant to Rule 30(b) of the Massachusetts Rules of Criminal Procedure.  Rosenthal Mot. New Tr., Supplemental Answer, Vol. 3, Tab 12, SAA135, ECF No. 11. This motion was denied in a Superior Court Memorandum and Order (the "Memorandum and Order"), dated July 24, 2009.[1]  Mem.

---

[1] On June 13, 2001, Rosenthal had filed an earlier Motion for New Trial.  Supplemental Answer vol.3,Tab 12, SAA7-9.  At his request, the trial judge took no action on that motion.  Id. at SAA138-39.  On October 13, 2006, Rosenthal filed his second post-appeal motion entitled Motion for Reduction in the Verdict or a New Trial ("Second-Post Conviction Motion").  Id. at SAA14.  The Commonwealth filed an Opposition dated January 5, 2007.  Id. at SAA99-121.  On January 24, 2007, Rosenthal filed a rejoinder to that Opposition.  Id. at SAA122.  On October 22, 2008, Rosenthal, represented by counsel, filed the present Motion for New Trial ("Motion for New Trial") and stated he was withdrawing the Second-Post Conviction Motion.  Id. at SAA135.  The arguments raised in the present Motion for New Trial are essentially similar to those asserted in the Second Post-Conviction Motion, except that there Rosenthal did not assert that appellate counsel was ineffective.  Id. at SAA135-269.

Decision & Order Def.'s Mot. For New Trial ("Mem. & Order"), Commonwealth v. Rosenthal, No. 95-01775 (Mass. Sup. Ct. July 24, 2009) (Kottmyer, J.) (the "motion judge"), ECF Nos. 1-4 to 1-6. On November 5, 2009, a single justice of the Supreme Judicial Court denied Rosenthal's application pursuant to Massachusetts General Laws chapter 278, section 33E, for leave to appeal. Order Den. Leave Appeal, Commonwealth v. Rosenthal, No. SJ-2009-0451 at 13 (November 5, 2009), ECF No. 1-6. On January 27, 2010, Rosenthal filed the present petition.

**B.  Facts**[2]

### 1.  The murder of Laura Rosenthal

On the night of August 28, 1995, Rosenthal killed his wife, Laura Rosenthal, by beating her with a rock, rupturing her eye and the surrounding bones, and destroying her face beyond recognition. Mem. & Order 2. He then sliced her torso, removed her organs, and impaled them on a stake, leaving them lying in the backyard of their home. Id. After murdering his wife, Rosenthal drove about aimlessly with his four-and-one-half month old baby in the back seat of his car. Id. After the police approached him, and before administering Miranda warnings, one of the officers offered to help Rosenthal, telling him that the

---

[2] Unless otherwise specified, this recitation of the factual background is drawn from the Memorandum and Order. These facts are presumed to be correct under 28 U.S.C. § 2254(e)(1). See Gunter v. Maloney, 291 F.3d 74, 76 (1st Cir. 2002).

sooner he told the police what was going on, the sooner he could
go home.  Id.  Rosenthal then told the police, "I'm driving
around to cool off.  I had an argument.  I had a fight.  I did a
terrible thing.  I'm having marital problems."  Id.  After the
police officers found bloody clothing in Rosenthal's car, they
advised him of his <u>Miranda</u> rights.  Id.  Rosenthal later claimed
that "he believed his wife was an 'enemy alien vampire,' part of
an invasion" and that the crime was committed in self-defense.
Id.

### 2.  Pre-Trial Mental Health Evaluations

On August 29, 1995, Rosenthal was arraigned in Framingham
District Court.  Id. at 2.  On that date, Dr. Hoffnung examined
him pursuant to Massachusetts General Laws chapter 123, section
15(a).  Id. at 2-3.  In her report, Dr. Hoffnung noted that
Rosenthal understood he was charged with the crime of murder:

> [He] was able to discuss the range of possible penalties.
> He indicated an understanding of various court
> procedures, such as plea bargaining.  He was able to
> correctly define the role of various court officers and
> to appreciate the adversarial nature of court hearings.
> He was able to discuss various defenses though initially
> confused between the meaning of a plea and legal
> strategy.  However, he accepted the explanation of his
> attorney and generally followed his advice.

Id. at 3 n.5.  She concluded that "while appearing generally
competent, there were some observations that raised doubt."  Id.
She reported that certain observations, including the fact that
there was "no recognition or acknowledgment that his wife was

dead or might be dead" raised the possibility of mental illness.
Id.  Dr. Hoffnung noted that Rosenthal referred to his wife as an
unidentified or unspecified person, stressing, however, that due
to the severity of her injuries, the body had to be identified
through dental records and that process had not yet taken place.
Id.  She stated that, on one occasion, Rosenthal began to answer
a question although his attorney had advised him not to answer
and that, at the end, he asked her whether this was "a big case."
Id.  Dr. Hoffnung later testified at trial that, when she asked
Rosenthal what alternatives he had to pleading not guilty, he
replied "after thinking for a while . . . self-defense, temporary
insanity, or a thyroid storm."   Id.

    After Dr. Hoffnung reported her findings, the court issued
an order committing Rosenthal to Bridgewater State Hospital
("Bridgewater") for an evaluation of competency to stand trial.
Id. at 3.  Pursuant to that order, Dr. Haycock attempted to
evaluate Rosenthal.  Id. at 3-4.  In a letter to the Framingham
District Court dated September 14, 1995, Dr. Haycock wrote that
Rosenthal informed him "that his lawyers had instructed him not
to speak with [Dr. Haycock] for the purposes of this evaluation."
Id. at 4.  Dr. Haycock released Rosenthal to the court without an
opinion on his competency.  Id.

    In September 1995, at the request of the Middlesex County
Jail, Dr. Schmidt evaluated Rosenthal pursuant to Massachusetts

General Laws chapter 123, section 18(a).  Id.  In his report to

the Framingham District Court dated September 15, 1995, Dr.

Schmidt wrote that Rosenthal was

> very unrevealing of his mental status, answering many
> questions with a refusal to answer or comment. He [said]
> he [was] not suicidal or homicidal now, but [said] he
> [could not] promise to tell if he [was] suicidal – 'Why
> would I tell you if I really wanted to do it?'"

Id. at 5.  Dr. Schmidt also reported that it was not clear to him

that the defendant had a mental illness, but there was "certainly

a strong possibility . . . [therefore] further inpatient evaluation

[was] warranted."[3]  Id.

On September 28, 1995, a Middlesex County grand jury

indicted Rosenthal for first-degree murder.  Id.  On the day

after, Rosenthal was arraigned before a clerk magistrate, at

which time the following exchange took place:

> [Defense Counsel]: Stands mute.
> CLERK: The defendant standing mute the Court will enter
> a plea of not guilty to this indictment.  Be seated, Mr.
> Rosenthal.
> THE DEFENDANT: Excuse me, I did have a statement to make,
> if the Court may allow it.
> . . . .
> [Defense Counsel]: I've advised him not to, but he wants
> to say something.
> [Commonwealth]: Your Honor, I think he should be inquired
> of as to guilty or not guilty and no more.
> CLERK: Fine. [Clerk,] would you ask the defendant how he
> pleads.
> [Commonwealth]: No, your Honor, that's what the Court has
> already done.  I would suggest that no further statement

---

[3] In a notation at the bottom of Dr. Schmidt's report, the
Framingham District Court (Kilmartin, J.) denied the
Massachusetts General Laws chapter 123, section 18(a), petition.

```
be appropriate.
CLERK: Thank you . . . . Fine.  Be seated, Mr. Rosenthal.
CLERK:  . . . .  Mr. Rosenthal, you're represented by
counsel and under the advice of counsel he does not wish
you to speak, so I do not want to hear from you at this
time.   What say you of this indictment, sir, are you
guilty or not guilty?
[THE DEFENDANT:] I understand, but at the same time I
would prefer to make a statement not on this case but on
something else.
CLERK: Not right now . . . . You'll have a time to give
a statement in due course.
```

Id. at 5-6.  In the affidavit supporting his Motion for New

Trial, Rosenthal stated that his only concern was to make a

statement to apologize for bringing on the air strikes in Bosnia.

Id. at 6.  On the same day, defense counsel, Norman Zalkind

("Zalkind"), contacted Dr. Whaley, who had been retained by the

defense to evaluate whether Rosenthal was criminally responsible

for the murder and who had already interviewed Rosenthal on

September 16, 1995.[4]  Id.  Dr. Whaley's notes reflected that

Zalkind reported to him that at arraignment, "pt wanted to talk

in ct & apolog for the bombing strikes in Bosnia?? compet."  Id.

He acknowledged that Zalkind raised the question of Rosenthal's

competence after the arraignment.  Id.  He also stated,

> However, the next time I met with Mr. Rosenthal
> [October 6, 1995], he appeared the same as he had been
> previously.  He was able to answer questions and
> interact with me in an appropriate fashion so I never
> performed the formal competency evaluation.  I did not
> specifically ask him about his understanding of the

---

[4] Dr. Whaley testified at trial that Rosenthal suffered from
a major illness, a delusional disorder, and was not criminally
responsible at the time of the murder.

> trial, the charges against him, or the function of the
> various roles of the courtroom participants, in that
> his mental functions at the time seemed to be grossly
> intact . . . .

Id. at 6.  Thereafter, additional petitions were filed to commit

Rosenthal to Bridgewater, pursuant to Massachusetts General Laws

chapter 123, section §18(a).  Id. at 6-7.  On each occasion, the

focus of the observation and examination was whether Rosenthal

posed a danger to himself or others if held at the Middlesex

County jail.  Id. at 8.  Rosenthal's competency to stand trial

was not evaluated.  Id. at 8.

On October 27, 1995, after receiving and meaningfully

discussing the Lamb warning, see Commonwealth v. Lamb, 365 Mass.

265 (1974), Rosenthal represented that he was becoming

increasingly depressed and that he was having suicidal thoughts.

Mem. & Order 7 n.11.  Dr. Schmidt reported that Rosenthal felt

> he's lost everything (e.g., house, wife, child); says he
> had the feeling (possibly belief) that his wife was alive
> but is now beginning to realize that she is not alive.
> He is guarded and refuses to expand on his statements,
> noting that he will discuss these issues with 'the state
> psychiatrist.'

Id.

On November 7, 1995, Dr. Haycock filed another report.  Id.

at 8.  In this report, he stated that he explained to Rosenthal

the Lamb warning and that the purpose of the evaluation was

different from the earlier evaluation as to competency.  Id.  Dr.

Haycock also reported that Rosenthal indicated understanding the

scope of the examination and warning, and mentioned that defense counsel had advised him against answering questions.  Dr. Haycock noted that Rosenthal (1) was able to track information well; (2) spoke in goal-directed sentences; (3) at no time appeared to be responding to internal stimuli; (4) was in no perceptible actual distress; (5) was guardedly cooperative; and (6) displayed no evidence of major psychological symptomatology.  Id.  Dr. Haycock added that Rosenthal's cognitive function and memory were grossly intact and that "there were no delusions elicited nor any delusional system."  Id. 8-9.  Dr. Haycock also reported that Rosenthal refused to comment on Dr. Schmidt's report and said he did not remember whether he had told anyone that he had suicidal thoughts or felt suicidal.  Id. at 9.  Dr. Haycock further stated that Rosenthal said that he wanted to return to jail and "stated he knew what answer he should give to [Haycock] about his experience there - namely to deny suicidal ideation - . . . to best further his chances of returning there."  Id. at 9.

On December 18, 1995, Rosenthal filed notice that he would assert a defense of lack of criminal responsibility.  Id.  On February 21, 1996, the court allowed the Commonwealth's motion for an order requiring Rosenthal to submit to an examination by no more than two qualified psychiatrists.  Id.  The motion judge observed that, after this order was issued, Rosenthal's reports of delusional thinking and his odd behaviors increased.  Id.

9

On April 17, 1996,[5] after examining Rosenthal, Dr. Pagan noted an increased withdrawal and isolation, weight loss, and bizarre behaviors. Id. at 7 n.11. Dr. Pagan also expressed his concern over Rosenthal's suicidality as reported by security staff. Id. Rosenthal's parents told the staff that Rosenthal was denying that they were his parents, raising further concern about delusional Rosenthal's thinking. Id. In addition, Dr. Pagan stated that Rosenthal was engaging in oppositional and threatening behavior. Id. He was committed to Bridgewater thereafter. Id.

During this April commitment, Rosenthal was evaluated by Dr. DiCataldo, who filed a report on April 25, 1996, noting that Rosenthal grasped the purpose of the interview and the confidentiality limits. Id. at 9. According to Dr. DiCataldo, Rosenthal "was able to evoke [those limits] at various times during the interview." Id. at 10. He also refused to answer certain questions by noting that the information was not directly relevant to the question of commitment to a psychiatric facility, or that he had been advised by defense counsel not to answer questions that might impinge on his legal case. Id. When answering the questions, Rosenthal "did so after careful consideration and typically delivered a well-measured and

_____

[5] The Memorandum and Order at various times gives the year 2006, instead of 1996. Mem. & Order 7 & n.11. Without further notation, the proper year is used herein.

succinct response devoid of spontaneity and elaboration." Id.
His thinking was logical and goal-directed. Id. He displayed no
sign of formal thought disorder. Id. He explained that he
preferred the jail to Bridgewater due to the more engaging
activities at the jail. Id. Dr. DiCataldo further stated that
it was unclear whether Rosenthal suffered from a mental illness.
Id. Rosenthal denied depression, hallucinations, or suicidal
ideation while in jail. Id. When asked about the identity of
his parents, he stated that "over the past six months they had
acted strangely over various instances that have made me doubt
their identity." Id. He refused to speculate as to what could
have happened to his parents and "at no time seemed distressed,
surprised or perplexed by his self-reported belief." Id. On the
advice of his attorney, Rosenthal refused to provide information
about his background, stating that it was not relevant to his
need for hospitalization. Id. Dr. DiCataldo concluded:

> [Rosenthal] reports having doubts about the identity of
> his parents and possible other family members. He
> reports that he began to believe this approximately six
> months ago. A definitive diagnosis is not possible at
> this time as he refuses to allow for a more thorough
> assessment of this possible symptom complex. He will
> openly admit to any and all who have asked him about his
> questioning of his parents's identity but steadfastly
> refuses to answer any probing questions about this belief
> and will not allow questions about the existence of
> possible delusions. The reasons about other areas is
> unclear at this time. The ambiguous nature of his self-
> reported symptom and his overall approach to this area
> raises the specter of deliberate malingering.

Id. at 10-11.

On May 23, 1996, Dr. Schmidt requested that Rosenthal be committed pursuant to Massachusetts General Laws chapter 123, section 18(a), after Rosenthal reported that "he could hurt himself." Id. at 7 n.12. On May 24, 1996, the Court denied the petition. Id. at 7. After this denial, Rosenthal administered cuts to himself that were "not superficial scratches."[6] Id. at 7 n.11. He was committed on June 12, 1996. Id. At this time, Dr. Schmidt evaluated Rosenthal and concluded that he was "an acute suicide risk." Id.

During this commitment, Dr. Haycock also interviewed Rosenthal. Id. at 11. Dr. Haycock reviewed the records and spoke to Rosenthal's parents and defense counsel. Id. At this time, Rosenthal demonstrated his understanding of the Lamb warning. Id. Rosenthal described hearing noises that were not actually present (e.g., sounds of mopping the floors, playing cards), but Dr. Haycock noted that Rosenthal provided scant details about the noises. Id. On June 18, 1996, after visiting him, Rosenthal's parents reported that he appeared to accept them as his parents. Id. On that same date, Rosenthal told a clinician, "I know they are my parents, but I've had my doubts." Id. He attributed the cutting that led to his commitment to "confused" or "cloudy" thinking, but was unable or unwilling to

---

[6] The Memorandum and Order does not mention the date of this incident, but it appears that it occurred on or around June 1996.

elaborate and downplayed the lethality of the act.  Id.  At this time, Dr. Haycock "discern[ed] no signs or symptoms consistent with a suicidal preoccupation."  Id. at 12.

On July 18, 1996, the trial court ordered Rosenthal to be committed after Dr. Schmidt's report stating that Rosenthal was "an acute suicide risk."[7]  Id. at 7 n.11.

During the July 18 commitment, Dr. Haycock evaluated Rosenthal once more.  Id. at 12.  By then, Dr. Haycock reported that Rosenthal "demonstrated a ready operational understanding of the [Lamb] warning, in that he was vigilant about answering any question he thought might bear on his legal case."  Id.  At one point, Rosenthal told Dr. Haycock that "after this was all over, he would enjoy having an unencumbered discussion of some of the points they discussed, but that was not possible currently."  Id. Rosenthal's mental status was essentially unchanged.  Id.  He appeared "able to evaluate connections between specific questions and possible points of interest to his legal case . . . . [T]here was no evidence of current major psychopathological symptomology" and "no suggestion of a formal disorder of thought."  Id. Rosenthal expressed doubts about his family, but was unable to give details about the causes of the doubts and declined to go further.  Id.  He also described hearing voices and sounds, but

---

[7] In this report, however, Dr. Schmidt also noted that "malingering is a possibility."  Id. at 7 n.11.

stated that these symptoms had improved at Bridgewater.   <u>Id.</u>

###     3.    The Trial

The trial took place in Middlesex Superior Court (Graham, J., presiding) October 15 to November 6, 1996.   <u>Id.</u> at 13. Rosenthal was represented by Zalkind and attorney Inga Berstein. <u>Id.</u>   Rosenthal did not dispute that he committed the murder, but asserted a defense of lack of criminal responsibility.   <u>Id.</u>   Dr. Strasburger and Dr. Whaley testified that Rosenthal suffered from a delusional disorder, in that he had believed a non-human alien was impersonating his wife and intended to kill him and that he therefore acted in self-defense.   <u>Id.</u>   Both doctors opined that Rosenthal was not criminally responsible.   <u>Id.</u>   The Commonwealth's expert, Dr. Fife, testified that the defendant had narcissistic personality traits and did not have a delusional disorder.   <u>Id.</u>   She also commented that he met three out of four of the diagnostic criteria for malingering.   <u>Id.</u>   Dr. Hoffnung also testified as to the statements Rosenthal made when he was evaluated on the day of his arraignment at the District Court. <u>Id.</u>

On October 30, 1996, after Rosenthal's experts had testified, his counsel asked for a bench conference at which the following transpired:

> [Defense Counsel]: . . . [T]he defendant has been acting
> a little bizarre lately.  He's talking about testifying
> now, and I want some time to talk with him.  He's
> growling.  He's making funny noises beside me.  This

started yesterday when his sister started to testify.
And before I can rest - I did not plan to put him on the
stand, Your Honor.  So, I need some time to make it very
clear if I can and to also say to myself whether he's
competent.  I mean, he was certainly competent in my mind
to stand trial up until now, but, you know, it would be
against my advice if he took the stand.  So I've got to
talk with this man.  And the Court Officer admits that he
was laughing out loud inappropriately yesterday when he
was walking upstairs . . . . I just need some time to
talk to him.

[After a recess during which defense counsel spoke to
[Rosenthal], the court held another bench conference.]

THE COURT: Have you had an opportunity to speak with your
client on this matter?
[Defense [C]ounsel]: Yes, and he is not going to take the
witness stand.
. . .
[Commonwealth]: I would ask that the Court make inquiry
of the defendant, given the state of the record, to make
sure that he personally waives his right to testify.
[Defense Counsel]: I won't let him testify even to the
Court.
THE COURT: All right.   And I'm going to honor the
defendant's request in that regard . . . .
[Defense Counsel]: If I caused a problem, leave it on -
it's not the Court's problem.  I'm not saying that the
Court is doing anything wrong.  I'll take whatever heat
I'm supposed to take on that.  As I mentioned to my
brother outside, you never know if there's a new trial,
a hung jury, and this could be used against him on an
insanity defense, Your Honor.
[Commonwealth]: Your Honor, again, also for the sake of
the record, given [defense counsel's] statements at the
last sidebar, I'd ask the Court to make inquiry as to
whether there's any substantial doubt about competency.
[Defense Counsel]: We feel satisfied that he's competent
to stand trial.  I can't tell you anything more than
that.  Sure, there's always some doubts when a man is as
sick as he is, and he's a very sick man, and there are a
lot of pressures that a trial brings out that you don't
have in more regular times, but I wouldn't have gone
forward trying this case unless I felt he was competent.
Am I a hundred percent sure?  No.  I am not a hundred
percent sure.   Do I think that he should be evaluated
for competency? No.  I don't think it's in his best

15

interest.
THE COURT: All right.  That covers that, in my opinion.

Id. at 14-15.

On November 7, 1996, the jury convicted Rosenthal of murder in the first degree based on extreme atrocity or cruelty, rejecting Rosenthal's claim that he lacked criminal responsibility.  Id. at 15.

### C.    Federal Jurisdiction

This Court may exercise jurisdiction over Rosenthal's petition for habeas corpus pursuant to 28 U.S.C. § 2254.

## II.  ANALYSIS

### A.    Antiterrorism and Effective Death Penalty Act

Pursuant to the Antiterrorism and Effective Death Penalty Act, a district court "shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a).  The habeas corpus petition should be granted only if the state court decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States[.]"  Id. § 2254(d)(1).

In Williams v. Taylor, 529 U.S. 362 (2000), the Supreme Court explained that a state court decision is "contrary to"

16

clearly established federal law "if the state court applies a rule that contradicts the governing law set forth in [Supreme Court] cases" or "if the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme Court] and nevertheless arrives at a result different from [Supreme Court] precedent." Id. at 405-06.  An unreasonable application of federal law occurs when "the state court identifies the correct governing legal principle from [Supreme Court] decisions but unreasonably applies that principle to the facts of the prisoner's case." Id. at 413.  The unreasonable application must be more than erroneous, it must be objectively unreasonable.  Id. at 409.

**B.  Competency to Stand Trial**

Rosenthal first argues that his bizarre behavior, including the observations of his growling and suicide attempt, was enough evidence to raise a question of possible doubt as to his competency to stand trial.  Pet. App. Attach. Grounds 1-2. Accordingly, he asserts that the lack of inquiry into his competency impacted his ability to assist counsel and to comprehend the proceedings against him.  Id.

The conviction of an accused person who is legally incompetent during trial violates due process.  Pate v. Robinson, 383 U.S. 375, 378 (1966).  The test for legal competency is whether "[the defendant] has sufficient present ability to

consult with his lawyer with a reasonable degree of rational understanding - and whether he has a rational as well as factual understanding of the proceedings against him." Drope v. Missouri, 420 U.S. 162, 172 (1975) (quoting Dusky v. United States, 362 U.S. 402, 402 (1960)).  Due process requires a court to hold a competency hearing sua sponte whenever evidence raises sufficient doubt as to the competency of the accused.[8]  Hill, 375 Mass. at 58 (noting that the evidence was so substantial at trial that the judge should have held a competency hearing).  In those situations where there exists doubt,

> evidence of a defendant's irrational behavior, his demeanor at trial, and any prior medical opinion on competence to stand trial are all relevant in determining whether further inquiry is required, but . . . even one of these factors standing alone may, in some circumstances, be sufficient.  There are, of course, no fixed or immutable signs which invariably indicate the need for further inquiry to determine fitness to proceed; the question is often a difficult one in which a wide range of manifestations and subtle nuances are implicated.

Drope, 420 U.S. at 180.

In the case at bar, the parties do not dispute the evidence relevant to Rosenthal's mental condition: his behavior during the

---

[8] No consistent phrase has been used to describe the precise quantum of doubt necessary to prompt a competency hearing.  In Pate, the Supreme Court required a "bona fide doubt" standard. Massachusetts, however, has adopted the "sufficient doubt" standard stated in Drope.  See Commonwealth v. Hill 375 Mass. 50, 54 (1978) (holding that the court has the duty to hold an evidentiary hearing when there is a "substantial question of possible doubt.")

arraignment and trial, his suicide attempt, and the Bridgewater reports.  Thus, this Court must determine whether the motion judge gave proper weight to this evidence when she concluded that Rosenthal's competency was not in sufficient doubt to require further inquiry.

The motion judge started by reviewing Dr. Strasburger, Dr. Whaley, and Dr. Ebert's affidavits in support of Rosenthal's Motion for New Trial.  Mem. & Order 20.  She noted that, although Dr. Strasburger and Dr. Whaley testified on Rosenthal's behalf, they never raised his alleged lack of competence to stand trial. Id.

Indeed, according to the Memorandum and Order, it was only in a post-trial affidavit where Dr. Strasburger suggested, for the first time, that Rosenthal was not competent to stand trial due to the nature and severity of his mental illness.  Id. Similarly, Dr. Ebert's post-trial affidavit also stated that, based on his review of Rosenthal's record, Rosenthal was suffering from a major mental illness before and after the trial and that there existed a serious question of competency.  Id.

The motion judge found these two affidavits unpersuasive. She concluded that they did not provide any observations or statements made by Rosenthal demonstrating his lack of rational understanding of the roles of the various participants in the trial, or his inability to consult with counsel.  Id. at 21; see

19

<u>Commonwealth</u> v. <u>Goodreau</u>, 442 Mass. 341, 351 (2004) (holding that mental illness alone does not govern the determination of competency).

Additionally, the motion judge acknowledged that Zalkind raised the competency issue with Dr. Whaley on the day of Rosenthal's arraignment.  <u>Id.</u> at 22.  Nevertheless, she underlined Dr. Whaley's October 1995 report stating:

> [Rosenthal] appeared the same as he had been previously. He was able to answer and interact with me in an appropriate fashion so I never performed the formal competency evaluation.  I did not specifically ask him about his understanding of the trial, the charges against him, or the functions of the various roles of the courtroom participants, in that his mental functioning at the time seemed to be grossly intact regarding these issues.

<u>Id.</u> at 22-23.  According to the motion judge, Dr. Whaley's observations were consistent with those of Dr. Hoffnung, who observed:

> [Rosenthal] was able to discuss the range of possible penalties.  He indicated an understanding of various court procedures, such as a plea bargaining.  He was able to correctly define the role of various court officers and to appreciate the adversarial nature of the court hearings.  He was able to discuss various defenses though initially confused between the meaning of a plea and legal strategy.  However, he accepted the explanation of his attorney and generally followed his advice.

<u>Id.</u> at 23.  Furthermore, the motion judge recognized as particularly compelling the fact that Rosenthal's defense counsel, "who were attentive to the issue [of competence]," decided not to raise it:

The absence of affidavits of trial and appellate counsel is particularly significant in this case because the materials produced by defendant and the trial record suggest that trial counsel were attentive to the question of defendant's competency from arraignment through trial, revisited the issue whether to request a court-ordered evaluation when there was a change of circumstances, and were satisfied that it was not in his best interest to submit a court-ordered evaluation.

[D]efense counsel, who had access to all the reports of psychiatrists and psychologists, had discussed the issue of competence with Dr. Whaley and had had the opportunity to observe the defendant and to assess first hand whether the defendant had a rational understanding of the process and the ability to consult with them - advised the Court that they were satisfied that the defendant was competent.

Id. at 22, 24-25.  Similarly, the motion judge credited and gave

weight to the trial judge's own observations:

The trial judge, who also had access to the Bridgewater reports, heard the testimony of the expert witnesses and had the opportunity to observe the defendant during a lengthy trial, accepted defense counsel's representation that defense counsel were satisfied that the defendant was competent.  See, e.g., Commonwealth v. DeMinico, 408 Mass. 230, 236 (1990) (holding that trial judge's observation of defendant's demeanor during trial was relevant to determination of competency); Commonwealth v. Goldman, 12 Mass. App. Ct. 699 (1981) (finding 'lack of any motion or request for an examination by [defendant's] trial counsel' was significant, and affording weight 'to the trial judge's first-hand opportunity to observe the defendant throughout the trial, and his implicit judgment that neither the behavior reported nor [defendant's] appearance was indicative of incompetence' (emphasis added)).

Id. at 25-26.  Thus, the motion judge ruled:

For the foregoing reasons, I find that the materials submitted by the defendant in support of this motion do not raise a substantial question of possible incompetency, i.e., a substantial question whether the defendant '[had] sufficient present ability to consult

21

with his lawyer with a reasonable degree of rational
understanding - and whether he [had] a rational, as well
as factual understanding, of the proceedings against
him.'   Because no substantial question as to the
defendant's competency arose at trial, the trial judge
did not have a duty to order an examination over the
defendant's objection.

Id. at 26 (citation omitted).

This determination is reasonable.  The Bridgewater reports,[9]

in combination with Zalkind's assurance that Rosenthal was

competent and the trial judge's own observations of Rosenthal's

competence to stand trial, are sufficient to reasonably support

the motion judge's conclusion that there was no reason to doubt

Rosenthal's competency.  See, e.g., Commonwealth v. Lyons, 426

Mass. 466, 469 (1998) (holding that the defendant's competency to

stand trial, when challenged, must be established by a

preponderance of evidence); Commonwealth v. DeMinico, 408 Mass.

230, 236 (1990) (holding that the trial judge's observation of

the defendant's demeanor during trial is relevant to a

determination of competency); Commonwealth v. Goldman, 12 Mass.

App. Ct. 699, 708 (1981) (finding "lack of any motion or request

for any examination by [the defendant's] trial counsel"

significant, and affording weight "to [the] trial judge's first-

hand opportunity to observe the defendant throughout the trial,

---

[9] These reports described Rosenthal's abilities to (1)
follow counsel's instructions; (2) parse out the relevance of the
interviewer's questions; (3) refuse to answer questions that
might affect his case; and (4) strategize the legal impact of his
statements.

and his implicit judgment that neither the behavior reported nor [defendant's] appearance was indicative of incompetence"). Thus, Rosenthal has failed to rebut the presumption of correctness afforded to the motion judge's findings of fact.

Furthermore, the motion judge's determination is not "contrary to . . . clearly established Federal Law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). The motion judge exhaustively reviewed the entire record under the guidelines established by Drope and Dusky and found no evidence sufficient to support a claim of incompetency to stand trial.[10] Rosenthal's competency claim that he was incompetent to stand trial is, therefore, denied.

### C. Ineffective Assistance of Counsel

The "clearly established Federal law" for analyzing claims of ineffective assistance of counsel is articulated in Strickland v. Washington, 466 U.S. 668 (1984).[11] In Strickland, the Supreme Court recognized that the Sixth Amendment's right to counsel is "the right to the effective assistance of counsel." Id. at 686. The principles set forth in Strickland were formulated into a

---

[10] The motion judge relied on Commonwealth v. Serino, 436 Mass. 408 (2002), and Commonwealth v. Russin, 420 Mass. 309 (1995). Both cases apply the standard established in Dusky and later followed by Drope.

[11] The motion judge relied on Commonwealth v. Saferian, 366 Mass. 89 (1974). This case is the Massachusetts analog to Strickland. See Scarpa v. Dubois, 38 F.3d 1, 7 (1st Cir. 1994).

two-prong test.  To show ineffective assistance of counsel,
Rosenthal must demonstrate (1) that counsel's performance was
deficient, and (2) that the deficient performance prejudiced the
defense.  Id. at 687; see also United States v. Hebshie, 754 F.
Supp. 2d 89, 111 (D. Mass. 2010) (Gertner, J.).

A court assessing such a challenge "must then determine
whether, in light of all the circumstances, the identified acts
or omissions were outside the wide range of professionally
competent assistance" and "must indulge a strong presumption that
counsel's conduct falls within the wide range of reasonable
professional assistance[.]"  Strickland, 466 U.S. at 689-690.

### 1.   Defense Counsel's Failure to Have Rosenthal Evaluated for Competency

Rosenthal claims that his trial counsel was constitutionally
ineffective because he did not move for a competency exam.  Pet.
App. Attach. Grounds 4.  According to Rosenthal, there was no
possible strategic reason for not holding a competency exam.  Id.
at 5.

When the motion judge rejected Rosenthal's ineffective
assistance of counsel claim, she stated:

> The defendant has not shown that trial counsel had reason
> to believe that he was not competent or that the
> objection by trial counsel to a court-ordered competency
> evaluation was unreasonable.  Ipso facto, he has not
> shown that failure of trial counsel to request the court
> to order an evaluation of competency constitutes
> 'behavior of counsel falling measurably below that which
> might be expected from an ordinary fallible
> lawyer . . . .'  Commonwealth v. Saferian, 366 Mass. 89,

24

96 (1974). Thus, the defendant's ineffective assistance of trial counsel fails as well.

Mem. & Order 26.

This decision is not unreasonable or contrary to "clearly established Federal law." 28 U.S.C. § 2254(d)(1). Rosenthal's counsel, who were aware of and attentive to the issue of competency, may have had tactical reasons not to hold, or even object to, a competency evaluation. In particular, during Rosenthal's trial, Zalkind explained that he would not have gone further with the trial had he thought that Rosenthal was incompetent. Mem. & Order at 15. As the Supreme Court has acknowledged, "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable[.]" Strickland, 466 U.S. at 690.

### 2. Validity of Rosenthal's Waiver of His Right to Testify

Rosenthal alleges that his defense counsel was ineffective when he prevented Rosenthal from testifying at trial. Pet. App. Attach. Grounds 3. He contends, in his affidavit, that he spent the recess in a holding cell and that his release from the cell was conditioned on his agreeing with his counsel's decision that he would not testify. Supplemental Answer, Vol. 2, Tab 10, SAA9-14. Rosenthal asserts that, if allowed to testify, he could have testified as to how sick he really was and what he was experiencing at the time of the incident. Pet. App. Attach.

Grounds 3.

Further, Rosenthal argues that the trial judge should have conducted a hearing into his waiver of the right to testify. Mem. Supp. Pet'r's Opp'n Resp't's Mot. Dismiss ("Memo. Opp'n Mot. Dismiss) 41, ECF No. 21.

It is clear that a defendant has a fundamental constitutional right to testify in his own defense. <u>Rock</u> v. <u>Arkansas</u>, 483 U.S. 44, 51-52 (1987). The right to testify may not be waived by counsel acting alone. <u>United States</u> v. <u>Mullins</u>, 315 F.3d 449, 454 (5th Cir. 2002). Where counsel has failed to inform a defendant of his right to testify, "silence alone cannot support an inference of such a waiver." <u>Chang</u> v. <u>United States</u>, 250 F.3d 79, 84 (2d Cir. 2001); <u>see also</u> <u>Owens</u> v. <u>United States</u>, 483 F.3d 48, 58 (1st Cir. 2007) (acknowledging that a defendant's silence at trial may not be interpreted as a waiver). There must be something in the record suggesting a knowing waiver. <u>See</u> <u>Owens</u>, 483 F.3d at 58. The Court is not, however, required to conduct a voir dire to determine whether the defendant knowingly waived his right to testify. <u>Id.</u> While the failure to inform a defendant of his right to testify constitutes deficient (or ineffective) assistance of counsel, <u>id.</u> at 58-59, advising a defendant not to testify may be a trial strategy and does not necessarily constitute deficient assistance. <u>See</u> <u>Siciliano</u> v. <u>Vose</u>, 834 F.2d 29, 31 (1st Cir. 1987).

26

In the case at bar, the motion judge recognized Rosenthal's fundamental right to testify in his own defense.  Mem. & Order at 27.  The motion judge concluded, however, that there was no clear evidence showing that Rosenthal was ever denied that right.[12]  Id. at 28.

In relevant part, the motion judge emphasized that Rosenthal said that he wanted to tell his side of the story to the trier of fact.  Id. at 27.  After Rosenthal expressed this desire, Zalkind, who had not planned to put Rosenthal on the stand, asked

---

[12] Rosenthal does not allege that Zalkind failed to inform him of his right to testify.  He merely contends that his waiver of that right was involuntary because (1) he was prevented from testifying by Zalkind, and (2) he was incompetent to stand trial. Pet. App. Attach. Grounds 2-4.

In opposing the Respondent's Motion to Dismiss, however, Rosenthal asserts, for the first time, that his defense counsel failed to inform him of his right to testify.  Mem. Opp'n Mot. Dismiss 48.  Nevertheless, the only facts that support this contention are those related to Rosenthal's alleged lack of competence.  In fact, Rosenthal's allegation that he was not properly informed of his right to testify is exclusively dependent on his claim that he was incompetent to stand trial. As the motion judge found:

> The materials submitted by the defendant . . . do not raise a substantial question of possible incompetency, i.e., a substantial question whether defendant '[had] sufficient ability to consult with his lawyer with a reasonable degree of rational understanding . . . .'

Mem. & Order 26.

Here, the record is devoid of any other evidence demonstrating that Rosenthal was not informed of his right to testify.  To the contrary, Rosenthal continuously expressed that he wanted to tell his side of the story to the trier of fact.

Pet. App. Attach. Grounds 2.

the trial judge for a recess to speak with Rosenthal.  Id.  At
that time, Zalkind stated that he wanted time to make clear to
Rosenthal that it would be against his advice as counsel for
Rosenthal to testify.  Id.  After this recess, Zalkind told the
trial judge that Rosenthal would not be testifying and that he
did not want the court to inquire about Rosenthal's decision not
to testify because it could undercut his insanity defense.  Id.
After discussing his right to testify with defense counsel during
the recess, Rosenthal never again stated or in any way indicated
that he wanted to testify.  Id.  Rosenthal does not dispute this
statement.  Instead, Rosenthal merely contends, in a
"self-serving affidavit," that he was coerced into agreeing with
Zalkind's decision.  Id. at 28.  The motion judge found
Rosenthal's self-serving affidavit not credible and further noted
that "[i]t is inconceivable that such a threat would be
effective," because Rosenthal was in the custody of the court
officers and did not tell the trial judge about the alleged
threat.  Id.  Indeed, the motion judge observed:

> The defendant, an intelligent and educated person, was
> well aware that he was in custody of court officers, that
> the Court and the jury were waiting and that the defense
> counsel could not prolong the recess indefinitely.  He
> does not explain why, when he was released from the
> holding cell and returned to the courtroom, he did not
> tell the judge about counsel's threat . . . .  The
> defendant's self-serving affidavit, written almost ten
> years after the alleged 'coercion' took place and
> supported by no other evidence, is insufficient to raise
> a substantial issue.

Id.

In light of the above and without any other evidence supporting Rosenthal's coercion allegations, it was reasonable for the motion judge to conclude that Rosenthal "has consequently not met his burden of showing by a preponderance of the evidence that his waiver was invalid." Id. Indeed, in all likelihood, Rosenthal knew he could testify and knowingly waived his right after discussing it with defense counsel. See Commonwealth v. Waters, 399 Mass. 708, 717 (1987) (noting that the judge was warranted in finding that the defendant knew he had a right to testify where the defendant was "quite familiar with our system of criminal justice" and never indicated a desire to testify or any conflict with his counsel). Rosenthal has failed to rebut this presumptively correct finding of fact by the motion judge.

Massachusetts law does not require a trial judge to conduct a colloquy with a defendant to assure on the record that the defendant has knowingly and voluntarily relinquished the right to testify. Commonwealth v. Siciliano, 19 Mass. App. Ct. 918, 920 (1984). As the First Circuit has stated, the question of "whether the accused will testify is primarily a matter of trial strategy to be decided between the defendant and his attorney." See United States v. Systems Architects, Inc., 757 F.2d 373, 375 (1st Cir. 1985). Zalkind explained that he did not want the trial court to question Rosenthal, because "you never know if

29

there's a new trial, a hung jury, and this could be used against him on an insanity defense." Mem. & Order 14-15. Accordingly, the motion judge found that

> defense counsel's conduct with respect to the defendant's right to testify, as exhibited during the Sidebar, is not an example of 'behavior of counsel falling measurably below that which might be expected from an ordinary fallible lawyer . . . .'

Id. at 28-29 (citations omitted). The motion judge added:

> [Rosenthal] also fails to explain what 'details [he] could not disclose previously' that he would have testified about and how those details would have worked in his favor. Indeed, the waiver was wholly consistent with trial strategy. [Rosenthal] has consequently not met his burden of showing by a preponderance of the evidence that his waiver was invalid.

Id. at 28.

Hence, even were this Court to consider that Zalkind's decision not to let Rosenthal testify was a poor tactical choice, the motion judge properly contended that Rosenthal cannot show that he was deprived of an otherwise available, substantial defense. See Saferian, 366 Mass. at 96. This determination is not contrary to the federal law clearly established by the Supreme Court. The motion judge applied the correct standard and decided that Rosenthal failed to show that Zalkind's conduct constituted unreasonable professional assistance and that he failed to show prejudice.

This decision is not unreasonable. Zalkind could have had a number of reasons for not letting Rosenthal testify. Further,

the motion judge reasonably concluded that defense counsel's mistake, to the extent it was a mistake, did not cause prejudice. Rosenthal asserted that he wanted to testify as to how sick he really was.  Pet. App. Attach. Grounds 3.  Ample evidence concerning Rosenthal's mental illness and incompetency was introduced during the trial.  Therefore, habeas relief on this ground must be denied.

> **D.    The Defense Counsel's Failure to File a Motion to Suppress Based on the Voluntariness of Rosenthal's Pre-Miranda statements**

Rosenthal contends that he was denied the effective assistance of counsel because his trial attorney only moved to suppress his post-Miranda statements and not his pre-Miranda statements.  Pet. App. Attach. Grounds 7.

At the October 1996 suppression hearing, Rosenthal's counsel limited Rosenthal's motion to suppress to post-Miranda statements.  Mem. & Order 29.  After a hearing on this motion, the court denied, in part, Rosenthal's motion to suppress post-Miranda statements, implicitly ruling that they were voluntary. Id.  At a pre-trial hearing on the day the trial began, defense counsel reiterated his intent to make defendant's pre-trial Miranda statements "a trial issue."  Id.  According to Rosenthal, his trial counsel should have attempted to suppress all of his statements as being involuntarily made under duress and the influence of a serious mental illness.  Pet. App. Attach.

Grounds 6.  Rosenthal claims he was prejudiced because the jury heard his statements that he was driving around to "cool off," had "had a fight," and "did a terrible thing."  Id. at 7.

When the motion judge rejected Rosenthal's ineffective assistance of counsel claim for failing to file a motion to suppress, she stated:

> Given the content of the statements and the defendant's demeanor at the time the statements were made, the decision not to challenge the pre-Miranda statements was clearly a tactical decision consistent with the defense of lack of criminal responsibility.  Moreover, the defendant has not shown that he was prejudiced by defense counsel's failure to raise the issue of the voluntariness of the pre-Miranda statements prior to trial.  'An officer may suggest broadly that it would be "better" for a suspect to tell the truth, may indicate that the person's cooperation would be brought to the attention of the public officials or others involved, or may state in general terms that cooperation has been considered favorably by the court in the past.'  Commonwealth v. Meehan, 377 Mass. 552, 564 (1979) (footnotes omitted).  The type of statement that is prohibited 'is an assurance, express or implied, that [the defendant's statement] will aid the defense or result in a lesser sentence.'  Id.  The police officer's statements to the defendant in this case were within - and were arguably more innocuous than - this realm of acceptable statements.  Therefore, the defendant's pre-Miranda statements were properly admitted at trial, and the defendant did not receive ineffective assistance of counsel because the choice not to raise the issue prior to trial was a reasonable tactical judgement . . . .
>
> Here, the statements were properly, albeit implicitly, deemed available, and defense counsel properly requested an instruction regarding the voluntariness of the statements which the court gave . . . . The court's Humane Practice Instruction was complete and accurate and discharged any duty the court had with respect to the admitted pre-Miranda statements.

Mem. & Order 29-31.

The motion judge's conclusion is not contrary to the federal law clearly established by the Supreme Court.  Indeed, a lawyer's performance is deficient only if counsel's choice is so unreasonable that no competent attorney would have made it.  Strickland, 466 U.S. at 689.  Here, defense counsel's decision not to challenge the pre-Miranda statements was tactical.  Allowing Rosenthal's statements to be presented to the jury is consistent with his defense of lack of criminal responsibility.  Rosenthal has failed to overcome the presumption that the challenged action was sound trial strategy. Id.  The decision of the motion judge is not unreasonable.  Hence, habeas relief on this ground must be denied.

### E.    Ineffective Assistance of Appellate Counsel

Rosenthal asserts that he was denied his constitutional right to the effective assistance of appellate counsel, where his counsel failed to raise the issues of (1) Rosenthal's competency to stand trial; (2) his trial counsel's ineffective assistance on the competency issue; (3) his trial counsel's ineffective assistance when he prevented Rosenthal from testifying on his own behalf; and (4) his trial counsel's ineffective assistance when he introduced Rosenthal's pre-Miranda statements at trial.  Mem. Opp'n Mot. Dismiss 46.

The Respondent challenges Rosenthal's Petition on two grounds.  First, the Respondent contends that Rosenthal failed to exhaust his state remedies as required by 28 U.S.C. §§ 2254(b),

(c).[13]   Resp't's Mem. Supp. Mot. Dismiss 37, ECF. No. 18-1.

Alternatively, he argues that had Rosenthal's claim of

ineffective assistance of appellate counsel been properly

---

[13] In fact, as the motion judge noted, Rosenthal dropped
this claim in his Motion for New Trial, and the motion judge
proceeded to decide only the issues before her: (1) whether
Rosenthal was deprived of due process by the trial judge's
failure to evaluate his competency to stand trial; (2) whether he
was deprived of due process by the trial judge's failure to
inquire into the validity of his waiver of his right to testify
and into the voluntariness of his pre-<u>Miranda</u> rights; and (3)
whether he was deprived of due process by ineffective assistance
of trial counsel where his trial counsel failed to secure any of
the above three procedural safeguards.  Two weeks after the
motion judge issued her Memorandum and Order denying Rosenthal's
Motion for a New Trial, Rosenthal filed two new motions: (1) a
Motion for Reconsideration, and (2) a Fourth Amended Motion for
New Trial.
    Rosenthal's Motion for Reconsideration reinserted the
ineffective assistance of appellate counsel claim, stating:

> The Defendant contends that there is ambiguity on the
> record with regards to the ineffective assistance of
> appellate counsel, which needs to be rectified.  The
> defendant included that specific claim in his previously
> filed Motion under 25(b)(2) and it was not specifically
> included in his Motion for New Trial under Rule 30(b).
> The Judge in her rulings on the Rule 30 impliedly
> addressed the issue of ineffective appellate counsel when
> it concluded that both trial and appellate counsel were
> both experienced and professional.  The defendant is
> requesting that the motion judge specifically address
> this issue and rule on defendant's amended motion.
> Further, the defendant is requesting that the judge
> actually rule on defendant's Motion for New Trial under
> Rule 25(b)(2) and is withdrawing his request that the
> motion be held in abeyance or not be acted upon.

Mot. Reconsider Decision Def.'s Mot. New Trial 12, ECF No. 1-6.
    On August 7, 2009, Rosenthal's Motion for
Reconsideration was denied, and the motion judge never
ruled on the Amended Motion for New Trial.   <u>Id.</u>
Rosenthal did not appeal this decision.

presented to the state courts, it would have been rejected
summarily.  Id. at 38-40.  In fact, the motion judge found no
support for the claims upon which the ineffective assistance of
appellate counsel claim is based.  The Respondent further argues
that Rosenthal did not present any new substantial claim
regarding the actions of trial counsel as part of the
underpinnings of the appellate ineffectiveness claim.

A claim for habeas corpus relief is exhausted if the claim
has been "fairly presented" to the state courts.  Baldwin v.
Reese, 541 U.S. 27, 29 (2004).  To fairly present a claim the
petitioner "must show that he tendered his federal claim 'in such
a way as to make it probable that a reasonable jurist would have
been alerted to the existence of the federal question.'"
Clements v. Maloney, 485 F.3d 158, 162 (1st Cir. 2007) (internal
quotation marks omitted).

The First Circuit held in Gagne v. Fair, 385 F.2d 4 (1st
Cir. 1987), that a habeas petitioner fairly presents a claim by:

> 1) citing a specific provision of the Constitution; 2)
> presenting the substance of a federal constitutional
> claim in such a manner that it likely alerted the state
> court to the claim's federal nature; 3) reliance on
> federal constitutional precedents; and 4) claiming a
> particular right specifically guaranteed by the
> Constitution.

Id. at 7.  In Nadworny v. Fair, 872 F.2d 1093, 1099-1100 (1st
Cir. 1989), the First Circuit added a fifth possibility, namely,
the assertion of a state law claim that is functionally identical

to a federal claim.  While the pleadings in the state and federal
courts need not be identical, "the legal theory [articulated] in
the state and federal courts must be the same."  Id. at 1100.
Indeed, "fair presentation requires that the constitutional
analysis necessary to resolve the ultimate question posed in the
habeas petition and in the state court proceedings, respectively,
be substantially the same."  Scarpa, 38 F.3d at 6.

     Under the Sixth and Fourteenth Amendments, a person has a
right to the effective assistance of counsel during a criminal
trial.  Williams, 529 U.S. at 390-91; Strickland, 466 U.S. at
687.  The Supreme Court in Strickland did not determine the
standard for evaluating claims concerning the effective
assistance of appellate counsel.  Nevertheless, it is
well-settled that Strickland applies to claims against appellate
counsel, in addition to trial counsel.  See Smith v. Robbins, 528
U.S. 259, 288-89 (2000) (holding that the proper standard for
evaluating the petitioner's claim that appellate counsel was
ineffective is the same standard enunciated in Strickland); see
also Smith v. Murray, 477 U.S. 527, 536 (1986) (applying
Strickland to a claim of attorney error on appeal).

     In the case at bar, Rosenthal's allegation that appellate
counsel was ineffective rests solely on appellate counsel's
alleged deficient selection of appellate issues.  Indeed,
Rosenthal argues that his appellate counsel was ineffective

because he failed to raise the following issues: (1) Rosenthal's competency to stand trial; (2) his trial counsel's ineffective assistance in dealing with this issue of competency; (3) his trial counsel's ineffective assistance in preventing him from testifying on its own behalf; and (4) his trial counsel's ineffective assistance in introducing his pre-<u>Miranda</u> statements at trial.  Mem. Opp'n Mot. Dismiss 46.

When an ineffective assistance of appellate counsel claim rests on the deficient selection of appellate issues, the primary, if not single, focus of the court is the merit or lack thereof of the unraised issues.  In the instant Petition, Rosenthal's ineffective assistance of appellate counsel claim rests on the same issues – and shares the same factual bases – that were before the motion judge when she rejected Rosenthal's claims concerning (1) his competency to stand trial; (2) his right to testify; (3) the voluntariness of his pre-<u>Miranda</u> statements; and (4) his ineffectiveness of trial counsel claim. <u>See generally</u> Mem. & Order.  Particularly, in the case at bar, both claims of ineffective assistance (ineffective assistance of trial counsel and ineffective assistance of appellate counsel) require a constitutional analysis that is substantially the same. <u>See</u> <u>Strickland</u>, 466 U.S. at 669 (holding that a petitioner must demonstrate (1) that counsel's performance was deficient, and (2) that the deficient performance prejudiced the defense); <u>see also</u>

United States v. Holliday, No. 02-10343, 2011 WL 3511471, at *7
(D. Mass. Aug. 11, 2011) (O'Toole, J.) (applying Strickland to
the petitioner's ineffective assistance of appellate counsel
claim).

On this premise, the inquiry into whether the appellate
counsel was ineffective is the same inquiry as that of the
ineffective assistance of trial counsel.  If the inquiries are
the same, it follows that the denial of the latter necessarily
leads to the denial of the former.

In Lanigan v. Maloney, 853 F.2d 40 (1st. Cir. 1988), in
deciding whether the petitioner's claim was exhausted, the First
Circuit held:

> [A]lthough the legal theory behind the claim raised to
> the state and federal courts must be the same, '[t]his
> does not mean that the petitioner must have expressed the
> theory in precisely the same terms.' Gagne v. Fair, 835
> F.2d 4, 7 (1st Cir. 1987).  See Picard v. Connor, 404
> U.S. 270, 277 (1971) ('[T]here are instances in which
> "the ultimate question for disposition" . . . will be the
> same despite variations in the legal theory or factual
> allegations urged in its support.')
> [The petitioner]'s claim to both the state and
> federal courts depends upon resolution of the same
> question – whether the language of the trial judge's
> instructions gave a clear sense of the degree of proof
> necessary to convict.  This is unquestionably a case in
> which the difference in petitioner's arguments to the
> state and federal courts represented 'a mere variation[]
> in the same claim rather than a different legal theory,'
> Wilks v. Israel, 627 F.2d 32, 38 (7th Cir. 1980). Such a
> difference does not preclude exhaustion.

Id. at 44-45.

As in Lanigan, Rosenthal's ineffective assistance of

appellate counsel claim, as argued, represents "a mere variation in the same claim rather than a different legal theory."  853 F.2d at 45.

Moreover, it is worth noting that Rosenthal's exhausted ineffective assistance of trial counsel claim was sufficient to alert the motion judge to Rosenthal's ineffective assistance of appellate counsel claim.  Indeed, although Rosenthal's claim of ineffective assistance of appellate counsel was not included in the original Rule 30 petition, the motion judge still addressed it when she ruled:

> The defendant was represented by competent experienced counsel at trial and on appeal.  Appellate counsel and trial counsel were unrelated to each other.  Tactical recommendations and decisions made by trial counsel were wholly consistent with a defense of lack of criminal responsibility.  The Supreme Judicial Court reviewed the entire record pursuant to G. L. c. 278, §33E and affirmed the conviction.  The materials submitted by the defendant in support of his motion do not contain sufficient credible information to cast doubt on the effectiveness of trial counsel or to raise a substantial question of possible doubt as to whether the defendant was competent to stand trial.

Mem. & Order 31.

Thus, this Court concludes that Rosenthal's ineffective assistance of appellate counsel claim is exhausted.  Lanigan, 853 F.2d at 45; see also Costa v. Hall, No. 00-12213, 2010 WL 5018159, at *5 (D. Mass. Dec. 2, 2010) (Wolf, C.J.).

This Court will now turn to the merits of Rosenthal's ineffective assistance of appellate counsel claim.  First, this

Court rejects Rosenthal's contention that his appellate counsel
was ineffective for not raising the issues of Rosenthal's
competency to stand trial, his right to testify, the
voluntariness of his pre-Miranda statements, and the
ineffectiveness of trial counsel claim.  As this Court concluded,
the manner in which the trial counsel and the trial judge dealt
with these issues was constitutionally adequate.  Moreover, this
Court is satisfied that Rosenthal could not have been prejudiced
by his appellate counsel's conduct as there were no meritorious
grounds for appealing the alleged unraised issues.  See
Strickland, 466 U.S. at 669; see also Hebshie, 754 F. Supp. 2d at
111.

## III. CONCLUSION

    Rosenthal's Petition does not establish that he is in
custody in violation of the Constitution or federal laws.
Therefore, his Petition for habeas corpus [ECF No. 1] must be,
and hereby is, DENIED.

    SO ORDERED.

                                    /s/ William G. Young
                                   WILLIAM G. YOUNG
                                   DISTRICT JUDGE